## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 20-CR-153-PAM-KMM |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| (1) JARVAE JOSIAH SOMERVILLE;<br>(2) RONALD DONTE FINLEY, JR.; | |
| Respondents. | |

This matter is before the Court on the motions to suppress evidence filed by Jarvae Josiah Somerville and Ronald Donte Finley. ECF Nos. 28, 30, 31, 43, 53, 56, 59, 60. All but four of these motions have become moot.[1] The Court held an evidentiary hearing on February 17, 2021. Minneapolis Police Sergeant Andrew Schroeder and Minneapolis Police Officer Kristopher Dauble testified on behalf of the government. The Court received Government's Exhibits 1–17 and Defense Exhibits 1a, 1b, 1c, 1d, 1e, 3a, and 3b into evidence. ECF Nos. 80–

---

[1]    In its response to the Defendants' motions, the government indicated that it has no wiretap or electronic surveillance evidence implicated by the motions at docket entries 30 (Finley) and 43 (Somerville). Similarly, the government indicated that it has no identification evidence and, if any is discovered, the government agreed not to use it in its case-in-chief. As a result, Mr. Somerville's motion at docket entry 53 is moot. Mr. Somerville's motion to suppress statements at docket entry 56 is also moot based on the government's agreement not to use any custodial statement by Mr. Somerville in its case-in-chief. During the hearing, counsel for the Defendants indicated that their challenges to the evidence obtained as a result of the execution of various search warrants were contingent upon the outcome of their motions challenging the arrests. Tr. of Hr'g (Feb. 17, 2021) ("Tr.") at 104–06, ECF No. 85. The remaining motions requiring discussion are those at docket entries 28, 31, 59, and 60. Because the Court finds that the Defendants' arrests did not violate their constitutional right and no alternative basis for suppression has been raised, the Court recommends that the relevant motions challenging such evidence be denied. ECF Nos. 28, 59.

81. Following the hearing, the parties submitted post-hearing briefing and the Court took the matters under advisement. ECF Nos. 86–90. For the reasons that follow, the Court recommends that the Defendants' motions be denied.

I.    **BACKGROUND**

*Initial Investigation and PC Pickup*

On May 19, 2020, Minneapolis Police received a call after a person with a gunshot wound arrived at Hennepin County Medical Center. Tr. at 23–24. Minneapolis Police Officer Kelly O'Rourke interviewed the victim, K.D.,[2] at the hospital. *Id.* K.D. had been shot "[i]n his back leg or close to his buttocks." *Id.* at 25. K.D. told Officer O'Rourke that he and three other individuals had been at a gas station near Franklin and Lyndale in Minneapolis. They left the store in their vehicle and were traveling west on I-94 near the Broadway exit when another vehicle pulled alongside of their car and fired several shots into their vehicle. *Id.* at 25–26. K.D. was not able to identify the shooter and provided no explanation for why someone might have shot at him. *Id.*

In the car with K.D. were two other adults, D.W. and K.G., and one minor, M.M. *Id.* at 26–27. When police interviewed D.W. and K.G., they obtained only a basic description of the shooters' appearance. *Id.* at 27. For example, K.G. could not provide a physical description of the shooters, including any details about their race. Def. Ex. 3a at 1. The three passengers in K.D.'s car also provided inconsistent descriptions of the vehicle from which the shots were

---

[2]    Although the shooting victim's full name was used during the motions hearing, the government has referred to him using only his initials, as the government did in its post-hearing briefing. The Court uses the first and last initial of the passengers in K.D.'s vehicle and another individual who was seen with the Defendants.

fired. One of the occupants stated that the shots were fired from a silver SUV; another said it was an SUV that was "maybe dark, maybe black, maybe silver"; and the third witness said the vehicle was a dark sedan. Tr. at 27–28; *see also* Def. Ex. 3b at 3:10–14, 7:20–24 (describing the vehicle as a silver or light grey SUV). A police report from the interview with K.G. indicated that he believed the vehicle was a "mid size SUV like a Ford Explorer…." Def. Ex. 3a.

Officer O'Rourke continued the investigation by obtaining surveillance video from the gas station where K.D. and the others had been shortly before the shooting. *Id.* On the video, police saw K.D., Mr. Somerville, Mr. Finley, and a man with the initials T.B.[3] *Id.* at 28–29. K.D.'s vehicle can be seen leaving the gas station parking lot, followed relatively quickly by a white sedan. Def. Ex. 1a at 24:29. A short time later, a silver SUV driven by T.B. could be seen leaving in the same direction as K.D. Tr. at 29–30. Another light-colored SUV pulled into the station parking lot while the silver SUV was sitting at a gas pump, and it left about three minutes after the silver SUV. Def. Ex. 1a at 20:30, 28:10. Traffic cameras did not capture the silver SUV driven by T.B. getting onto or driving on I-94, which is several blocks from the gas station, and they did not capture the shooting near the West Broadway exit. Tr. at 54–55.

Minneapolis Police maintain records of suspected gang membership. These records indicate that T.B. "is a documented, self-admitted Low End gang member, specifically belonging to the Stick Up Boys or commonly referred to as SUB." *Id.* at 30. "Low End" is a

---

[3]    Surveillance video provided to the Court as Defense Exhibit 1a shows a wide view of the gas station parking lot. From reviewing the footage, the Court is unable to see the features of any individual's face. It is not clear whether Sergeant O'Rourke obtained other surveillance footage from inside the gas station, or what other basis he had to make these identifications. Tr. at 28 ("Q: Now, was Sergeant O'Rourke able to get surveillance video from the Speedway gas station? A: He was.").

term used to refer to a geographical area of North Minneapolis south of West Broadway. *Id.* According to these records, Mr. Somerville is also a member of the SUB. *Id.* K.D, on the other hand, is a suspected member of the "Tre Tre Crip" gang, which is "an umbrella group of a rival gang from the Highs, meaning higher than West Broadway." *Id.* K.D. told police that he had been a member of this gang more than ten years ago. *Id.* at 48–49; Def. Ex. 1c at 2:45– 2:48. Sergeant Schroeder explained that for many years, "the Highs and the Lows have been in a violent gang feud. … [T]here are shootings to this day in North Minneapolis involving the Highs versus the Lows." Tr. at 30–31.

Based on the information gathered to that point, Sergeant O'Rourke concluded that there was probable cause to issue "PC pickups" for the May 19th shooting for Mr. Somerville, Mr. Finley, and T.B. *Id.* at 31. A "PC pickup" is shorthand for "probable cause pickup," which is not the same as a "charging warrant." It is a document prepared by law enforcement that directs officers who encounter the subject to arrest them. *Id.* It is neither signed by a judge nor a prosecutor. The PC pickups for Mr. Finley and Mr. Somerville were issued on June 2nd and 3rd, about two weeks after the shooting. Gov't Exs. 1 & 2; Tr. at 32–33. Over the next few weeks, Minneapolis Police took several steps to locate Mr. Somerville and Mr. Finley, including "surveillance, tracking orders, speaking to probation/parole, [and consulting] previous police records." Tr. at 32.

On July 8th, Sergeant Schroeder was conducting surveillance at Mr. Somerville's residence. *Id.* at 34. He saw Mr. Somerville leave the residence in an Infiniti sedan with another man, later identified as Mr. Finley. *Id.* at 34–35. Officers eventually followed the Defendants to a restaurant on Lake Street in South Minneapolis. *Id.* at 35. Mr. Somerville backed the car

4

into a parking spot near the front of the restaurant, and then he and Mr. Finley got out of the vehicle and went inside. *Id.* Because Somerville and Finley were together, Sergeant Schroeder, who was accompanied by another eight to ten officers, decided to arrest them both. *Id.* at 36.

Law enforcement had "surrounded" the restaurant, with officers in a nearby alley, marked police cars north of the store, undercover officers in an adjacent towing yard, and unmarked vehicles nearby. *Id.* at 36–37. Sergeant Schroeder and several other officers who worked with him in the "Gun Unit" were wearing plainclothes instead of uniforms. However, they also wore black tactical vests that say "Police" on the front and the back, and they were prominently displaying law enforcement badges. *Id.* at 37.

### Mr. Finley's Arrest

When Mr. Somerville and Mr. Finley first exited the restaurant, Mr. Finley sat in the front passenger seat of the car. Mr. Somerville went back inside the store. *Id.* at 38. Officers had "devised a plan to effect the arrest and once [Mr. Somerville] went back in, [Sergeant Schroeder] put the plan into motion." *Id.* Several officers focused on Mr. Finley and Officer Schroeder and another group of officers planned to go inside the restaurant to arrest Mr. Somerville. *Id.*

One of the officers who was involved in Mr. Finley's arrest was Minneapolis Police Officer Kristopher Dauble. Officer Dauble and his partner, Justin Stetson, were wearing plainclothes and the black tactical vests described above. Tr. at 82–83. Officer Dauble approached the passenger side of the Infiniti sedan where Mr. Finley was sitting, and Officer Stetson approached the driver's side. *Id.* at 83–84; Gov't Ex. 6 at 1:00–1:05. Both officers had their guns drawn, facing Mr. Finley. They were pointing their weapons in Mr. Finley's

direction. Tr. at 91, 92, 93; Gov't Ex. 6 at 1:00–1:05. Officer Stetson shouted at Mr. Finley to "put your fucking hands up," as he opened the driver's side door, which he did to "see what Mr. Finley was doing." Tr. at 84, 94; Gov't Ex. 7 at 1:00–1:02. Neither officer announced that they were police, and no one shouted to Mr. Finley that he was under arrest as they approached the vehicle or first made contact with Mr. Finley. *Id.* at 93; Gov't Ex. 7 at 1:00–1:12.

After Officer Stetson opened the driver's side door, Mr. Finley briefly looked up from his cell phone to his left and then "shot up out of his seat and tried to run," leaving the vehicle through the passenger side door. Tr. at 93; Gov't Ex. 7 at 1:03. Officer Dauble chased after Mr. Finley to the front of the restaurant, along the sidewalk, and back into the parking lot. Tr. at 84–85. At the same time, Sergeant Schroeder was approaching the front door of the restaurant, and he could hear other officers attempting to arrest Mr. Finley and shouting commands. *Id.* at 38–39. Suddenly, Mr. Finley appeared in front of Sergeant Schroeder, running from the officers who had approached him, and Sergeant Schroeder grabbed Mr. Finley's shirt to slow him down until the other officers could apprehend him. *Id.*; Gov't Ex. 8 at 1:05–1:10.

Mr. Finley physically struggled with the officers, but they eventually handcuffed him in the parking lot and patted him down. Tr. at 86; Gov't Ex. 7 at 1:12. The officers then took Mr. Finley to a marked squad car in an alley near the restaurant and, although he continued to struggle with them, shouted for help, and used his feet to prevent them from placing him in the squad car, the officers eventually got him into the vehicle's rear seat. Tr. at 86.

After Mr. Finley and Mr. Somerville had both been arrested, officers looked inside the Infiniti sedan. Officer Dauble explained that they searched the car because both of the

occupants had been arrested and police would be towing the vehicle from the scene.[4] *Id.* at 86–87. When officers looked inside the vehicle, they found a SIG Sauer handgun between the passenger seat and the center console. Tr. at 87; Gov't Ex. 5. Mr. Finley is charged with unlawful possession of this firearm.

### Mr. Somerville's Arrest

While Mr. Finley was being arrested, Sergeant Schroeder and Officer Jesse Standal continued inside the restaurant to apprehend Mr. Somerville. Tr. at 39. When Sergeant Schroeder entered the restaurant, he saw Mr. Somerville standing next to the counter, near a walkway leading back to the kitchen. *Id.* at 39–40. Sergeant Schroeder testified that he shouted something like "Somerville, police, you're under arrest, get on the ground." *Id.* at 40. However, the audio from his body worn camera footage indicates that neither he nor Officer Standal identified themselves as police officers; nor can they be heard shouting to Mr. Somerville that he was "under arrest." Go'vt Ex. 8 at 1:12–1:25. As the officers approached Mr. Somerville, he was standing by the small restaurant's front counter. He turned away from the officers and began running through the kitchen. Tr. at 40; Gov't Ex. 8 at 1:20–1:25. Sergeant Schroeder and Officer Standal followed him through the kitchen and around a corner. Tr. at 40. Mr. Somerville entered a small bathroom and tried to slam the door, but Sergeant Schroeder forced the door open and followed him inside. *Id.* at 40–41; Gov't Ex. 8 at 1:20.

---

[4]     Minneapolis Police Department has a towing policy that requires officers to conduct an inventory of a vehicle's valuable contents if it is being impounded. *Id.* at 44–45, 87; Gov't Ex. 16.

Inside the bathroom, Mr. Somerville and Sergeant Schroeder had a "violent struggle" that destroyed the room. *Id.* at 41; Gov't Ex. 4; Gov't Ex. 8 at 1:20–1:50. Sergeant Schroeder's chest was pressed up against Mr. Somerville's back. He testified that Mr. Somerville's hands "went almost immediately to his waistband," which was concerning because Sergeant Schroeder's training and experience led him to believe Mr. Somerville was reaching for a weapon. Tr. at 41–42. With his own hands, Sergeant Schroeder "could feel [Mr. Somerville] in possession of a gun." *Id.* at 42. During the struggle, Sergeant Schroeder was focused on preventing Mr. Somerville from bringing the gun out of his pants. *Id.* Sergeant Schroeder shouted several times for Mr. Somerville to "stop reaching" during the struggle inside the bathroom. At least once, Mr. Somerville responded "I'm not." Gov't Ex. 8 at 1:20–1:50. Other officers came into the bathroom to help Sergeant Schroeder. Eventually, they pulled Mr. Somerville into the hallway, brought him to the ground, and placed him in handcuffs. *Id.* Afterward, the officers retrieved a handgun from the floor of the bathroom. Tr. at 42–43; Gov't Ex. 4. Mr. Somerville is charged with unlawfully possessing that firearm.

## II.    DISCUSSION

Mr. Somerville and Mr. Finley argue that they were arrested in violation of the Fourth Amendment because police did not have probable cause to believe that they were involved in criminal activity. They both argue that the guns found by police after they were arrested must be suppressed as fruit of their unlawful arrests. Somerville Mem., ECF No. 87; Finley Mem., ECF No. 86. As discussed below, Court recommends that the Defendants' motions to suppress evidence be denied.

### A.  Probable Cause to Arrest for the Shooting

The parties agree, as they must, that the PC Pickups issued by the Minneapolis Police Department for Mr. Somerville and Mr. Finley are not valid arrest warrants. Neither was issued by a neutral and detached magistrate presented with an affidavit establishing probable cause. However, the parties dispute whether officers had probable cause to arrest Mr. Somerville and Mr. Finley for the May 19, 2020 shooting of K.D. based on the information known to law enforcement at the time of the arrests.

"A warrantless arrest that lacks probable cause violates the Fourth Amendment." *Robbins v. City of Des Moines*, 984 F.3d 673, 679 (8th Cir. 2021). But a warrantless arrest supported by probable cause does not. *United States v. Flores-Lagonas*, ___ F.3d ___, 2021 WL 1228061, at *5 (8th Cir. Apr. 2, 2021). "Probable cause exists when the totality of the circumstances at the time of arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Id.* (internal quotation marks omitted). Courts draw their conclusion about probable cause based on the "the facts known to the arresting officer at the time of the arrest." *Id.* at *6 (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). But courts must consider whether probable cause exists by examining the "collective knowledge" of all law enforcement officers involved in the investigation. *United States v. Edwards*, 891 F.3d 708, 711–12 (8th Cir. 2018) ( explaining that "'probable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication'") (quoting *United States v. Horne*, 4 F.3d 579, 585 (8th Cir. 1993)).

Officers do not need to "witness actual criminal activity or have collected enough evidence … to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest." *United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013). However, "bare suspicion of criminal activity is insufficient to establish probable cause," *United States v. Morales*, 923 F.2d 621, 624 (8th Cir. 1991), and law enforcement must conduct a "reasonably thorough investigation prior to arresting a suspect…." *United States v. Evans*, 851 F.3d 830, 835 (8th Cir. 2017). As the Eighth Circuit has recently explained:

> Probable cause is not a high bar: It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians act. *But it is a bar.* An arrest must be supported by more than a reasonable, articulable suspicion that a person committed a crime. There must be a fair probability or a substantial chance that the person seized has committed an offense.

*Bell v. Neukirch*, 979 F.3d 594, 603 (8th Cir. 2020) (emphasis in original) (cleaned up).

Based on the record presented, the Court finds that the officers did not have probable cause to arrest Mr. Somerville or Mr. Finley for the shooting of K.D. Put simply, the facts known to the officers when they approached the Defendants at the restaurant on July 8, 2020, did not establish a fair probability that they were responsible for shooting at K.D.'s vehicle. Based on what the record shows the officers knew, a reasonable and prudent person might have had a suspicion that Mr. Somerville and Mr. Finley were involved, but the Fourth Amendment requires more.

Officers knew that K.D. had been shot a couple of miles away from a gas station where K.D. and three acquaintances had been not long before they got on the highway. Surveillance footage showed that Mr. Somerville and Mr. Finley were at the gas station at the same time as K.D. and his companions. A police database noted that Mr. Somerville and T.B. are suspected

members of a gang that has been involved a longstanding, violent dispute with a rival gang, of which K.D. was believed to be a member or a former member. Surveillance footage showed K.D.'s vehicle leave the gas station, and not long thereafter, the silver SUV carrying Somerville, Finley, and T.B. left through a different exit, but headed in the same general direction. One of the witnesses riding in the car with K.D. suggested that the vehicle from which the shots had been fired may have been a silver SUV, while another said the vehicle was "maybe dark, maybe black, maybe silver." Tr. at 28. Though these facts do not rule out the inference drawn by the officers—that Mr. Somerville and Mr. Finley committed the offense—they show little more than proximity of the Defendants to the victim sometime shortly before an assault and a generalized suspicion that they followed K.D. out of the parking lot. This is not enough.

The Court's conclusion is buttressed by other information known to law enforcement that did not directly implicate the Defendants in the shooting. No shell casings were recovered from the scene, nor did the officers have any ballistic or forensic evidence pointing to the Defendants. Sergeant Schroeder admitted that officers did not have traffic-camera footage showing the silver SUV traveling on Interstate 94 after it left the gas station. It is not even clear from the record whether officers attempted to obtain or review such footage. Tr. 54–55. None of the three witnesses in K.D.'s car identified either of the Defendants, nor described a suspect who resembled them.[5] There was no evidence that officers showed the witnesses

---

[5]     The Court credits Sergeant Schroeder's testimony that, in his experience investigating gang-related shootings over the years, witnesses are often not cooperative with law enforcement because they "don't want to labeled as a snitch" and will not "tell on their most outspoken enemies." Tr. at 76–77. However, nothing in the record suggests that the passengers in K.D.'s vehicle had any affiliation with a gang. Indeed, Sergeant Schroeder also suggested that the traumatic nature of being shot at could also explain the witnesses' inability

(*footnote continued on next page*)

surveillance footage or photographs of Mr. Somerville or Mr. Finley, nor that they asked the witnesses if any of them knew the Defendants.

Several aspects of the gas station video on which the officers based their suspicion actually undermine probable cause that Mr. Somerville and Mr. Finley were responsible for the shooting. First, the surveillance video available to the Court does not show any confrontation at the gas station between K.D. and anyone else, including the Defendants. In fact, the two groups of people give no outward appearance of knowing one another at all. Def. Ex. 1a. Second, the silver SUV did not leave the parking lot immediately after K.D.'s vehicle. In fact, the surveillance footage shows that there was a gap of over a minute and twenty seconds between the departures of K.D.'s sedan and the silver SUV, with another vehicle leaving just after K.D. Def. Ex. 1a. And third, from the surveillance footage the police knew only that the silver SUV turned out of the parking lot in the same general direction as K.D.'s sedan. Thus, the officers were acting on a bare hunch that the silver SUV *followed* K.D.'s vehicle rather than drawing practical, commonsense conclusions from the facts.

Sergeant Schroeder's description of a long-time feud between rival gangs does not push this case over the line from one involving inchoate suspicions to probable cause for an arrest.[6] Law enforcement's awareness that two groups of people linked to rival gangs were in the same

---

to provide substantial details about a suspect or a suspect vehicle. And even if the Court could infer that K.D. and his passengers knew more than they are letting on, that does nothing to strengthen the probable cause that Mr. Somerville and Mr. Finley were the shooters.

[6]    Sergeant Schroeder's generalized testimony that "there are shootings to this day every day in North Minneapolis involving the Highs versus the Lows" was not accompanied by a more detailed description of any events that may have involved these Defendants or K.D. Tr. at 31.

area not long before one of those groups was fired upon is certainly relevant to the totality of circumstances that inform probable-cause analysis. But here, police knew little more than that the two groups were at the same gas station and their vehicles left the parking lot around the same time traveling in the same general direction. No evidence suggests that the two groups were even aware of the other's presence at the store. To find probable cause under these circumstances would stretch the fair-probability standard beyond its limits.

The government argues that because both Mr. Somerville and Mr. Finley began to flee as soon as officers approached them, this indicates they were conscious of wrongdoing and provides further indicia of probable cause to arrest them for the May 19, 2020 shooting of K.D. In support of this argument, the government relies on the Supreme Court's decision in *District of Columbia v. Wesby*, 138 S. Ct. 577 (2018). Gov't Resp. at 15, ECF No. 88. Given the facts of this case, the government's reliance on *Wesby* is unavailing.[7] While flight might contribute to probable cause to suspect a defendant of the crime of arrest under certain circumstances, it does not do so here.

In *Wesby*, officers responded to a call that a loud party was going on at a vacant house. When they arrived on the scene, officers spoke with neighbors who confirmed the house was vacant. As they approached the house, they could hear loud music. When they knocked on the door, someone stuck his head out of a window and, upon seeing police, ran upstairs. Someone eventually let the officers inside the home, where they saw a very dirty floor, evidence

---

[7]    For reasons discussed below, however, the Court concludes that Mr. Somerville and Mr. Finley's flight provides an independent basis for probable cause to arrest for the crime of fleeing police.

of cups and beer bottles lying around, and no furniture in the downstairs area except for a few

padded metal folding chairs. The officers also discovered a makeshift strip club in one room.

When the partygoers saw the officers, many fled to other parts of the house. Officers

interviewed 21 people at the home and were told that someone named "Peaches" had given

the partygoers permission to use the house. Though Peaches was initially evasive and claimed

she had received permission to use the house from the owner, she eventually admitted that

she did not. At that point, the officers arrested the 21 partygoers for unlawful entry. Those

charges were ultimately dropped, and 16 of the 21 partygoers sued the District of Columbia

and the arresting officers under 42 U.S.C. § 1983, claiming that the arrests violated their Fourth

Amendment rights. *Id.* at 583–84.

The Supreme Court concluded that there was probable cause to arrest for unlawful

entry based, in part, on the partygoers' flight:

> The partygoers' reaction to the officers gave them further reason to believe that the
> partygoers knew they lacked permission to be in the house. Many scattered at the sight
> of the uniformed officers. Two hid themselves, one in a closet and the other in a
> bathroom. Unprovoked flight upon noticing the police, we have explained, is certainly
> suggestive of wrongdoing and can be treated as suspicious behavior that factors into
> the totality of the circumstances. *Illinois v. Wardlow*, 528 U.S. 119, 124–125 (2000). In
> fact, deliberately furtive actions and flight at the approach of ... law officers are *strong*
> indicia of *mens rea. Sibron v. New York*, 392 U.S. 40, 66 (1968) (emphasis added). A
> reasonable officer could infer that the partygoers' scattering and hiding was an
> indication that they knew they were not supposed to be there.

*Id.* at 587 (cleaned up).

For two reasons, the flight in this case is distinguishable from that in *Wesby*. First, the

wrongdoing suspected in *Wesby* was still ongoing when the partygoers fled upon noticing the

police. Here, the Defendants were not similarly caught in the act. Rather, they ran from the

police on July 8, 2020, almost two months after the May 19th shooting they were suspected

14

of having committed. Under these circumstances, it is difficult to conclude that their flight reflects consciousness of *any* specific wrongdoing, let alone the shooting from many weeks before. Second, the partygoers' flight in *Wesby* was particularly relevant because the reasonableness of the arrest depended on whether the officers could infer that the partygoers knew they were not supposed to be in the house. *See* 138 S. Ct. at 584–86 (discussing the validity of the arrest based on whether the officers could reasonably infer that the partygoers knew or should have known that they lacked permission to be in the home). This case, in contrast, involves a suspected assault with a firearm, which does not require an inference of which flight would necessarily be probative.

In sum, the Court concludes that police did not have probable cause to arrest Mr. Somerville and Mr. Finley for the shooting at the time the PC Pickup was issued or when the officers first attempted to arrest them. And, under the circumstances of this case, the Defendants' flight did not transform the officers' mere suspicion into probable cause to arrest for that offense.

**B. Probable Cause and the Defendants' Flight**

The Court's conclusion that probable cause was lacking when the PC Pickup was issued does not end the inquiry. The government argues that, even if officers did not have probable cause to arrest Mr. Somerville and Mr. Finley as they first approached them, when the Defendants fled "they violated Minnesota law and created and created an independent basis upon which to arrest them." Gov't Resp. at 16–18. Based on the totality of the circumstances, the Court finds that the Defendants' flight provides independent probable cause for their arrests.

Very recently, in *United States v. Flores-Lagonas*, the Eighth Circuit addressed circumstances in which a defendant's flight created probable cause to arrest independent of the original offense under investigation. There, officers were working in connection with a cooperating individual ("CI") to set up a controlled delivery of methamphetamine from Mr. Flores-Lagonas. 2021 WL 1228061, at *1. Officers established surveillance around a parking lot where the delivery was set to take place. They observed Flores-Lagonas and his co-defendant, Perez-Juarez, exit a minivan and enter a Target. *Id.* Inside the store, Flores-Lagonas gave Perez-Juarez a cell phone to call the CI to set up a meeting in the parking lot. *Id.* Flores-Lagonas returned to the minivan, drove around the parking lot, and parked across from where Perez-Juarez and the CI arranged to meet. *Id.* At that point, officers moved in to arrest Flores-Lagonas and Perez-Juarez. Two officers drove up to the minivan in an unmarked police vehicle. They got out and approached Flores-Lagonas in the minivan with their weapons drawn. *Id.* at *2. "Seeing the officers approach, Flores-Lagonas attempted to flee" and a car chase followed. *Id.* He lost control of the vehicle, skidded off the road, and came to a stop in a field. *Id.* When officers approached him again with their weapons drawn, he got out of the minivan and ran across the field, until they caught and arrested him. *Id.*

On appeal from the denial of a suppression motion, Mr. Flores-Lagonas argued that the officers did not have probable cause to arrest him. *Id.* at *5. The court rejected that argument, explaining that it had "consistently held that a defendant's response to an arrest or *Terry* stop—even an invalid one—may constitute independent grounds for arrest." *Id.* at *6. The *Flores-Lagonas* court concluded that Mr. Flores-Lagonas's flight in the car and on foot

16

provided independent probable cause to arrest him for violating Minn. Stat. §§ 609.487(3) (regarding flight in a motor vehicle) and 609.487(6) (regarding fleeing on foot). *Id.*

The *Flores-Lagonas* decision is consistent with several cases that held that a defendant's flight or resistance in response to a *Terry* stop or arrest, even an unlawful arrest, can provide an independent basis for an arrest. *See United States v. Smith*, 789 F.3d 923, 929 (8th Cir. 2015) ("Smith's resistance by fleeing the scene provided independent grounds for his arrest, and the evidence discovered in the subsequent searches of his automobile is admissible.") (quotation marks omitted); *United States v. Blackmon*, 662 F.3d 981, 985–86 (8th Cir. 2011) (lack of responsiveness to officer commands and raising of fists as if to fight provide probable cause to arrest Mr. Blackmon for resisting arrest under Missouri law); *United States v. Sledge*, 460 F.3d 963, 966 (8th Cir. 2006) ("'In our circuit, resistance to an illegal arrest can furnish grounds for a second, legitimate arrest.'") (quoting *United States v. Schmidt*, 403 F.3d 1009, 1016 (8th Cir. 2005)); *United States v. Dawdy*, 46 F.3d 1427 (8th Cir. 1995) ("Although the Eighth Circuit has not previously addressed this precise issue, we now hold that a defendant's response to even an invalid arrest or *Terry* stop may constitute independent grounds for arrest.").[8]

Following these cases, and considering the totality of the circumstances, the Court concludes that Mr. Somerville's and Mr. Finley's flight provided independent probable cause

---

[8]    *See also United States v. Gant*, Crim. No. 12-61 ADM/TNL, 2012 WL 2060637 (D. Minn. June 8, 2012) ("Even if the initial traffic stop lacked probable cause, Gant's flight from a police officer and refusal to obey a police officer's directives were sufficient indicia to lead Officer Nelson to reasonably believe that Gant was committing a crime—namely the misdemeanor of evading a police officer. Because Gant's flight provided Officer Nelson with probable cause that he was committing a crime in his presence, Gant's arrest was proper and the subsequently acquired evidence is admissible.").

to arrest them for fleeing police under Minn. Stat. § 609.487(6).[9] Here, the record supports the conclusion that the officers believed they were acting in the lawful discharge of their duties as law enforcement officers, and to evade them, the Defendants ran. The officers knew that they shouted commands at both Mr. Somerville and Mr. Finley to put their hands in the air and to get on the ground. Though several of the officers wore plainclothes and did not shout "Police!" or "You're under arrest" as they approached either Mr. Somerville or Mr. Finley, they wore tactical vests that identified themselves as police, displayed law enforcement badges on their chests, and behaved in a manner completely consistent with multiple officers making an arrest. In response to their commands, both Mr. Somerville and Mr. Finley fled on foot, and physically resisted arrest. Under these circumstances, it was reasonable for the officers to conclude that both Mr. Somerville and Mr. Finley were attempting to avoid being arrested by running away. Therefore, the Defendants' flight supplies probable cause for their arrests.

Mr. Somerville and Mr. Finley raise several arguments in an attempt to distinguish the facts of this case from *Flores-Lagonas* and others upholding findings of probable cause based

---

[9]    Under Minnesota law, the following statute defines the crime of fleeing police on foot:

> Whoever, for the purpose of avoiding arrest, detention, or investigation, or in order to conceal or destroy potential evidence related to the commission of a crime, attempts to evade or elude a peace officer, who is acting in the lawful discharge of an official duty, by means of running, hiding, or by any other means except fleeing in a motor vehicle, is guilty of a misdemeanor.

Minn. Stat. § 609.487(6). There is no dispute that even though fleeing police is a misdemeanor, an arrest for such an offense based on probable cause does not violate the Fourth Amendment. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 355 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").

on a defendant's flight or resistance. The Court addresses each of these arguments below. Ultimately, the Defendants' arguments do not change the Court's conclusion that their flight provided independent probable cause.

### Awareness That Police Were Approaching

Both Defendants argue that they did not know they were being approached by law enforcement because the officers were not in uniform and had drawn their weapons with both hands in front of their torsos, obscuring their badges and the word "Police" from their viewpoints. Somerville Mem. at 12, 14, ECF No. 87; Finley Mem. at 6–7, ECF No. 86. For two reasons, one legal and the other factual, this argument is not persuasive. First, as a legal matter, this argument focuses the probable-cause inquiry on the information that is known to the wrong person—the suspect. Indeed, the *Flores-Lagonas* court rejected a nearly identical argument for that very reason. 2021 WL 1228061 at *6. Like the Defendants here, Mr. Flores-Lagonas suggested that probable cause for flight was lacking because he did not know the armed men approaching him were officers. He argued that he fled, not to evade arrest, but "because he feared for his life when he saw unknown men with weapons drawn." *Id.* The court explained that "[e]ven if true, Flores-Lagonas's perception of the officers is not relevant because we draw our conclusion from the facts known to the arresting officer at the time of the arrest." *Id.* The same is true here—Mr. Somerville's and Mr. Finley's purported perceptions of the armed men approaching them does not inform the probable-cause analysis. Instead, the Court must consider what the officers conducting the arrest knew.

Second, even crediting that neither Mr. Somerville nor Mr. Finley saw the clear markings on the officers' tactical vests, the Court finds that the Defendants were aware that

the men approaching them were police. It is true, as the Defendants point out, that unlike in *Flores-Lagonas*, the officers did not shout, "Police," or "You're under arrest," when they initially approached, and doing so is undoubtedly preferred. 2021 WL 1228061 at *6. However, the officers who approached Mr. Finley did so during daylight hours, in a parking lot occupied by several other cars. Similarly, they approached Mr. Somerville inside of a restaurant where other patrons waited on their food and employees were working. Though not all gun crimes are committed at night or in secluded places, if this were an unprovoked attack or some form of retaliation, it is very unlikely that it would occur under circumstances such as these. It is even more unlikely that the perpetrator of such a crime would, before firing a single shot, repeatedly shout to the potential victim to put his hands in the air and get on the ground, as the officers did here. Even when such commands are accompanied by profanity, they are quintessential law enforcement orders that accompany an arrest. Additionally, the sheer number of officers on the scene was far more consistent with a perception that they were police than that they may have been criminals.[10]

### When the "Seizure" Occurred

Next, to the extent the Defendants suggest that their flight cannot establish independent probable cause because they had already been "arrested" before they ran, the

---

[10]     The Defendants' conduct after the officers caught up to and struggled to subdue them further belies any suggestion that they had no idea they were being approached by police. Both Defendants continued to struggle with officers as they were being placed in handcuffs and, in Mr. Finley's case, right up until he was placed in a marked squad car. Had they run away only because they truly believed they were being approached by armed people with criminal intent rather than law enforcement, their attempts at evasion would have ceased much sooner.

Court disagrees.[11] Such an argument is foreclosed by longstanding Supreme Court precedent. In *California v. Hodari D.*, 499 U.S. 621 (1991), a juvenile named Hodari ran away from an approaching police vehicle, and one of the officers in the squad car gave chase on foot. *Id.* at 622–23. As Hodari was running, he threw aside "what appeared to be a small rock," which was later recovered and found to be crack cocaine. *Id.* at 623. After he tossed the rock, he was tackled by the pursuing officer. *Id.* Hodari moved to suppress the drugs as the product of an unlawful arrest, and the California appellate courts agreed. *Id.* However, the Supreme Court reversed, concluding that Hodari had not been "seized," within the meaning of the Fourth Amendment, at the time he dropped the drugs. At that point, he was running away from an officer who had begun to chase him, but who had never made physical contact with him. *See id.* at 629. The Court, referencing the common-law rule of arrest, noted that the application of physical force, however slight, subjects a person to a Fourth Amendment seizure. *Id.* at 625. Although a Fourth Amendment seizure can also occur as a result of an officer's "show of authority," in that context, a seizure does not happen unless the subject yields. *Id.* at 625–26. As the *Hodari D.* Court put it: "An arrest requires *either* physical force … *or*, where that is absent, *submission* to the assertion of authority." *Id.* at 626 (emphasis in original).

Here, in response to the officers' show of authority in the parking lot (with respect to Mr. Finley) and inside the restaurant (with respect to Mr. Somerville), neither man yielded to the police commands. Applying *Hodari D.*, no Fourth Amendment seizure occurred until Mr. Finley and Mr. Somerville were subjected to the application of physical force. That did

---

[11]    *See* Somerville Reply at 2, ECF No. 90.

not occur until after both men attempted to flee, so their flight preceded any Fourth Amendment seizure.

Mr. Somerville argues that the rule in *Hodari D.* was modified based on the Supreme Court's recent holding in *Torres v. Madrid*, 141 S. Ct. 989 (2021). He suggests that because the officers objectively intended to restrain him when they pointed their weapons at him and shouted commands, he had, in fact, been subjected to a seizure before he fled. As a result, he contends that his flight cannot provide independent probable cause for an arrest. *See* Somerville Reply at 2–3, ECF No. 90. This argument misapprehends *Torres*'s holding and its relevance, if any, to this case.

In *Torres*, officers approached an apartment complex to execute an arrest warrant on a woman expected of committing several crimes. 141 S. Ct. at 994. As the officers approached, Ms. Torres was outside the complex with another person, standing near a vehicle. *Id.* "The officers wore tactical vests marked with police identification, [but] Torres saw only that they had guns." *Id.* She got into the car as they approached, and believing them to be carjackers, she sped away. *Id.* The officers fired several shots into her vehicle and Ms. Torres was hit twice, but continued to drive away, eluding officers until she was later apprehended by police at an Albuquerque hospital, receiving treatment for her wounds. *Id.* She pled guilty to certain state law crimes, and later brought a civil rights claim under § 1983, claiming that the officers "used excessive force, making the shooting an unreasonable seizure under the Fourth Amendment." *Id.* Though the lower courts rejected her claim on summary judgment, the Supreme Court reversed and remanded, holding that even though Ms. Torres eluded capture after the shooting, the application of physical force to her body (*i.e.*, the bullets that struck her)

22

was a seizure even though it did not succeed in subduing her. *Id.* at 995–99. In its reasoning,

the *Torres* court explained:

> We stress, however, that the application of the common law rule [regarding the application of physical force constituting an arrest] does not transform every physical contact between a government employee and a member of the public into a Fourth Amendment seizure. A seizure requires the use of force *with intent to restrain*. Accidental force will not qualify. Nor will force intentionally applied for some other purpose satisfy this rule. In this opinion, we consider only force used to apprehend.

*Id.* at 998.

Thus, the *Torres* Court clarified that for a government official's physical contact to

qualify as a Fourth Amendment seizure, it must be accompanied by an intent to restrain the

person seized. But *Torres* does not undermine *Hodari D.*'s holding that a person who does not

yield to an officer's "show of authority" has not been subject to a seizure, unless there has

been physical contact. Here, there was no application of physical force to either Defendant

until after they ran. When both Defendants fled, the officers shouting commands

unquestionably intended to restrain them. But there was no application of physical force to

the Defendants' persons until after the flight. Therefore, *Torres*'s holding does not inform the

question of when Mr. Somerville and Mr. Finley were "seized."

### *Multi-Part Attenuation Analysis*

Relying on *United States v. Becker*, 333 F.3d 858 (8th Cir. 2003), Mr. Somerville next

suggests that even if his flight created independent probable cause, the Court must apply a

multi-factor attenuation test to determine whether the "taint of the illegal arrest was …

purged." Somerville Mem. at 11–12. The Court concludes that *Becker*'s multi-part test is not

applicable to these circumstances. Mr. Becker was stopped in his vehicle on suspicion that he

had been involved in a domestic disturbance at a nearby residence. A pat-down of his person revealed a metal tin that officers did not remove from his pocket at that time. The officers' justifiable basis for the traffic stop later dissipated when they learned that the residents did not wish to press charges against Mr. Becker. *Becker*, 33 F.3d at 859–60. Believing that Mr. Becker may have been under the influence of drugs, however, officers continued detaining him and asked if he would consent to a second pat-down search. Mr. Becker agreed, and the second pat-down again revealed the presence of the metal tin in his pocket. *Id.* at 860. The officer asked Mr. Becker if he could open the tin, and Mr. Becker again gave his consent. The tin contained a substance that Mr. Becker later admitted was methamphetamine. *Id.* Mr. Becker sought to suppress the drugs, but the district court denied his motion.

On appeal, the Eighth Circuit affirmed the district court's conclusion that Mr. Becker voluntarily consented to the search, but explained that the inquiry did not end with the court's analysis of the validity of consent. Instead, the court still had to consider "whether Becker's consent was given in circumstances that render[ed] it an independent, lawful cause of [officers'] discovery of the methamphetamine." *Id.* at 861–62. That inquiry was required because "voluntary consent to a search, preceded by an illegal police action, does not automatically purge the taint of an illegal detention." *Id.* at 862. To reach that determination, the court considered the following factors: "(1) the temporal proximity between the illegal search or seizure and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *Id.* Applying these factors the court found that the lapse in time between the unlawful detention and Mr. Becker's consent was long enough that the two could be unlinked; officers' concern that he was under the influence of

drugs constituted intervening circumstances that purged the taint of the unlawful detention; and there was no showing of flagrant police misconduct. *Id.* at 862–63.

*Becker* does not change the outcome here for at least two reasons. First, it is not clear that *Becker*'s multi-factor analysis, also known as the "attenuated connection doctrine,"[12] applies to a case involving flight. None of the Eighth Circuit's flight or resistance cases, like *Flores-Lagonas*, *Smith*, *Blackmon*, *Sledge*, *Schmidt*, or *Dawdy*, engage in a similar multi-part analysis. Indeed, neither Defendant points to any Eighth Circuit case in which the attenuation doctrine was applied to a case involving flight. Instead, the flight and resistance cases instruct courts to ask whether, under the totality of the circumstances, the response to an attempted stop or arrest provides an independent basis for probable cause to arrest the defendant for a crime separate from the one police originally suspected was committed. Here, the Court has concluded that the Defendants' flight did just that.

Second, the Court concludes that, even if attenuation analysis applied to cases in which a person flees in the face of an arrest later found to be unlawful, such flight constitutes a sufficient "intervening circumstance" under *Becker*. Indeed, the only case in this Circuit that even considered attenuation under similar facts reached the same conclusion. *See United States v. Hardy*, No. CR08-0077, 2009 WL 1687955, at *5–6 (N.D. Iowa June 17, 2009). The *Hardy* court found that the defendant's flight itself was an intervening circumstance justifying arrest

---

[12]    *See, e.g.*, *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975) (discussing attenuation doctrine as an exception to the exclusionary rule); *United States v. Reinholz*, 245 F.3d 765, 779 (8th Cir. 2001) (explaining that under the attenuation doctrine "the challenged evidence is admissible if the causal connection between the constitutional violation and the discovery of the evidence is so attenuated as to rid the taint").

for a new crime and the arrest was not an exploitation of prior unlawful police conduct. *Id.* (rejecting the Mr. Hardy's argument that evidence was not admissible under the attenuation doctrine, reasoning that "[t]he officers were not 'exploiting' the search so Defendant would run and they would discover new evidence"). Even if attenuation analysis was relevant, Mr. Somerville's and Mr. Finley's flight was a sufficient intervening circumstance to purge the taint of the unsupported attempts to arrest each of them for the shooting.[13]

### Right to Flee Unlawful Arrest

Finally, Mr. Somerville argues that he had a right to flee from the officers' unlawful arrest. Pointing to the language of Minn. Stat. § 609.487(6) and the Minnesota Supreme Court's decision in *State v. Kutchara*, 350 N.W.2d 924 (Minn. 1984), Mr. Somerville contends that officers could not legitimately arrest him for fleeing because they were not acting in the "lawful discharge of an official duty" as required by the statute when they attempted to arrest him for the shooting without probable cause. Somerville Mem. at 15–16. For two reasons, the Court rejects this argument.

First, Mr. Somerville's argument is contrary to Eighth Circuit case law. The flight and resistance cases discussed above stand for the proposition that "a defendant's response to an arrest or *Terry* stop—*even an invalid one*—may constitute independent grounds for arrest." *Flores-*

---

[13]     There is no showing that here that the officers conducting the arrest engaged in any flagrant misconduct. Indeed, the record shows that they understood their decision to arrest the Defendants to be adequately supported by probable cause and to be authorized by a PC pickup issued by their department. The fact that this Court has found that belief to be mistaken does not transform their conduct into flagrant wrongdoing.

*Lagonas*, 2021 WL 1228061, at *5 (emphasis added). Mr. Somerville's argument ignores the italicized language from the rule.

Second, Mr. Somerville's argument takes *Kutchara*'s language out of context to suggest that Minnesota law recognizes a right to resist arrest by fleeing where the arrest is not supported by probable cause. But the *Kutchara* court rejects this premise: "Minnesota law does not recognize the right to resist an unlawful arrest or search." 350 N.W.2d at 927. Minnesota law does recognize that a person has "a right to defend himself or another against an unjustified bodily attack" by police, *State v. Wick*, 331 N.W.2d 769, 771 (Minn. 1983), and to run away from an *assault* by an officer, *Kutchara*, 350 N.W.2d at 927. But Minnesota case law is clear that "fleeing a police officer is not constitutionally protected conduct and is the subject of a separate criminal offense." *State v. Morin*, 736 N.W.2d 691, 698 (Minn. Ct. App. 2007); *see also State v. Ingram*, 570 N.W.2d 173, 178 (Minn. Ct. App. 1997) ("A defendant may not resort to self-help to resolve disputes concerning unreasonable searches and seizures, because the legal safeguards under the Fourth, Fifth, Sixth, and Fourteenth Amendments provide the victim of an unlawful search with realistic and orderly legal alternative to physical resistance."). *Kutchara* provides no support for Mr. Somerville's position that he had a right to flee because the officers were mistaken in thinking there was probable cause to arrest him for the shooting of K.D.

For all these reasons, the Court concludes that Mr. Somerville and Mr. Finley's flight provided independent probable cause for their arrests.

27

### C. Seizure of the Gun in the Restaurant

Mr. Somerville argues that the weapon seized from the floor of the restaurant must be suppressed because it is fruit of an unlawful arrest. Because the Court has found that Mr. Somerville's Fourth Amendment rights were not violated by his arrest, and because Mr. Somerville points to no other basis to suppress the weapon, the Court recommends that his motion to suppress the gun be denied.[14]

### D. Search of the Infiniti Sedan

Mr. Finley argues that the firearm found next to the passenger seat in the Infiniti sedan should be suppressed because it was not discovered pursuant to a lawful inventory search. He also suggests that the inevitable discovery doctrine does not apply because the government presented no evidence to show that the firearm would have been discovered without unconstitutional conduct by the officers on the scene. *See* Finley Mem. at 9–11. The Court concludes that the search of the car that led to discovery of the gun was justified under the automobile exception. Accordingly, the Court need not discuss the other possible bases for the search of the car identified by the government.

---

[14] The Court notes that even if a separate challenge had been raised to the seizure of the gun, it would have been unsuccessful in this case because the officers could not simply have left the gun lying on the floor of a restaurant. Also, at that point, the gun was in plain view, officers had a lawful basis to be inside the restaurant, and Sergeant Schroeder already knew Mr. Somerville was a felon, Tr. 42, making the gun's incriminating nature immediately apparent. *United States v. Roach*, No. CRIM. 2:09-684-PMD, 2010 WL 234900, at *5 (D.S.C. Jan. 15, 2010) ("[A]fter placing Defendant under arrest, a 9mm pistol hidden in his waistband fell out of his pant legs and into plain view. Since the pistol was in the officers' plain view and its incriminating nature was immediately apparent, Officer Kruger did not violate any of Defendant's constitutional rights by seizing it.") (citing *Horton v. California*, 496 U.S. 128, 136–37 (1990), *aff'd*, 477 Fed. App'x 993 (4th Cir. 2012).

A warrantless search of a vehicle is permissible when officers "have probable cause to believe that the car contains contraband or other evidence" of criminal activity. *United States v. Edwards*, 891 F.3d 708, 712 (8th Cir. 2018) (citing *California v. Acevedo*, 500 U.S. 565, 580 (1991)). Police have probable cause to search a vehicle "where there is a fair probability that contraband or evidence of a crime will be found" in it. *United States v. Shackleford*, 830 F.3d 751, 753 (8th Cir. 2016) (quotation marks omitted).

In his reply brief, Mr. Finley asserts that the search of the Infiniti sedan is not justified under the automobile exception because the government presented no evidence to indicate that police believed the vehicle might contain evidence of a crime. Finley Reply at 2. The Court disagrees. The record establishes that when the vehicle was searched, officers had probable cause to believe that the vehicle would contain evidence of Mr. Somerville being a felon in possession of a firearm. Sergeant Schroeder testified that he knew Mr. Somerville was a felon when he followed him into the bathroom. Tr. 42. Mr. Somerville had already been arrested, and his gun had already been found on the floor, when the vehicle was searched. *Id.* at 87. Under these circumstances, the information available to the officers established a fair probability that the car Mr. Somerville had driven to the restaurant would contain evidence of the crime of being a felon in possession. They could reasonably conclude that the vehicle contained ammunition, a holster, paperwork, or other evidence that might be relevant to proving such an offense. *See United States v. Rousseau*, No. 13-CR-0014 PJS/FLN, 2013 WL 1788082, at *2 (D. Minn. Apr. 26, 2013) (concluding that officers had "ample reason" to search the defendant's vehicle for evidence concerning a violation of § 922(g) where a search of the

defendant's person incident to his arrest turned up ammunition he was prohibited from possessing).

Second, Mr. Finley points to testimony at the hearing that officers subjectively believed they were searching the Infiniti pursuant to the Minneapolis Police Department's inventory policy. *See* Tr. 44, 87. But reviewing courts do not look to the officers' subjective intent when determining whether, under the automobile exception, there was probable cause supporting the search of a vehicle. *United States v. Oliver*, No. CR 15-164 (DSD/BRT), 2015 WL 13731345, at *6 (D. Minn. Oct. 13, 2015) ("Because the subjective motives and intentions of officers have no place in Fourth Amendment analysis, which asks only whether the officers' actions were objectively reasonable, the validity of an automobile search does not depend on whether the ostensible ground for the search was different and improper and the existence of probable cause does not hinge on what the particular officers involved believed but on what a reasonable officer in their position would have believed."), *report and recommendation adopted*, No. CR 15-164 (DSD/BRT), 2015 WL 7432334 (D. Minn. Nov. 23, 2015); *Cf. Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). Despite the officers' testimony regarding the basis for searching the car, a reasonable officer in their position would have believed that they had probable cause to search the car for evidence regarding Mr. Somerville's unlawful possession of a firearm.

## III.    RECOMMENDATION

Based on the foregoing, the Court makes the following recommendations:

1.    Mr. Finley's Motion to Suppress Evidence Obtained Pursuant to Search Warrants (ECF No. 28) be denied.

2.    Mr. Finley's Motion to Suppress Evidence Obtained from Electronic Surveillance and Wiretapping (ECF No. 30) be deemed moot.

3.    Mr. Finley's Motion to Suppress Evidence as a Result of Illegal Stops, Arrests and Searches (ECF No. 31) be denied.

4.    Mr. Somerville's Motion to Suppress the Contents of Any Intercepted Wire or Oral Communications and Evidence Derived Therefrom (ECF No. 43) be deemed moot.

5.    Mr. Somerville's Motion to Suppress ID Evidence (ECF No. 53) be deemed moot.

6.    Mr. Somerville's Motion to Suppress Statements (ECF No. 56) be deemed moot based on the government's decision not to use Mr. Somerville's statement in its case-in-chief. However, if the government changes its mind regarding use of the statement, Mr. Somerville should be permitted to reopen this issue.

7.    Mr. Somerville's Motion to Suppress Evidence Obtained Pursuant to Search Warrants (ECF No. 59) be denied.

8.    Mr. Somerville Motion to Suppress Evidence as a Result of Illegal Stops, Arrests, and Searches (ECF No. 60) be denied.

Date: May 13, 2021

_s/Katherine Menendez_
Katherine Menendez
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.